1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - -    X

4    UNITED STATES OF AMERICA,    :    CR 04-182

5                                 :

6

7         -against-               :
                                       United States Courthouse
                                       Brooklyn, New York
8    THOMAS RACHKO,               :

9                                      October 13, 2006
          Defendant.              :    11:30 o'clock a.m.
10

11   - - - - - - - - - - - -    X

12                  TRANSCRIPT OF SENTENCING
             BEFORE THE HONORABLE CAROL BAGLEY AMON
13              UNITED STATES DISTRICT JUDGE

14

     APPEARANCES:
15

     For the Government:              ROSLYNN R. MAUSKOPF
16                                    United States Attorney
                                      BY: ADAM ABENSOHN
17                                    Assistant United States
                                      One Pierrepont Plaza
18                                    Brooklyn, New York

19
     For the Defendant:               JEFFREY LICHTMAN, ESQ.
20                                    COURTNEY BLACK, ESQ.

21
     Court Reporter:                  Gene Rudolph
22                                    225 Cadman Plaza East
                                      Brooklyn, New York
23                                    (718) 260-2538

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

GR      OCR      CM      CRR      CSR

2

1      THE CLERK:   United States versus Thomas Rachko.

2      (Counsel present; appearances noted.)

3      THE COURT:   Counsel, is there any legal reason why

4   we shouldn't proceed with this sentencing this morning?

5      MR. LICHTMAN:   No, Your Honor.

6      THE COURT:   Have you read the presentence report and

7   addendums?

8      MR. LICHTMAN:   Yes.

9      THE COURT:   Mr. Rachko, have you read the resentence

10   report and the addendums?

11      THE DEFENDANT:   Yes, Your Honor.

12      THE COURT:   Have you had adequate opportunity to

13   discuss those with your counsel?

14      THE DEFENDANT:   Yes.

15      THE COURT:   Are you satisfied to have him represent

16   you?

17      THE DEFENDANT:   Yes, Your Honor.

18      THE COURT:   All right.   I take it, we had some

19   guideline issues, a dispute between the government and the

20   defense over the appropriate guideline.   Apparently, I guess,

21   Mr. Lichtman, you had known since June that this was an issue.

22   Right?

23      MR. LICHTMAN:   I have, Judge.

24      THE COURT:   I didn't get letter until October,

25   which -- October 10th, which raised these problems which seem

1   to be fairly significant.

2         MR. LICHTMAN:   Maybe I can address a little bit of
3   this.

4         To begin, obviously, we recognize that the
5   5K1 -- the significance of it is such that the specific
6   guidelines issues are not as extreme or as acute as they
7   otherwise would be.   That being said, Your Honor is tasked
8   with finding a guideline range before anything else can go
9   forward, even in the post Booker era and regardless of the
10  5K1.

11        I can't argue the two points for the firearm in a
12  factual sense because I think that they exist and I think they
13  are appropriate.

14        The issue was, and I -- I don't mean to press this
15  too hard, but when the plea agreement was made, we had had an
16  agreed upon sentence.

17        Now, do --

18        THE COURT:   Agreed upon sentence?

19        MR. LICHTMAN:   An agreed upon range, excuse me,
20  guideline range.

21        This is evidenced by comments that are in the
22  cooperation agreement that talk about the adjustments that the
23  defendant was stipulating to.

24        As Your Honor also saw in my October 10th letter
25  with the enclosure, on the morning of the plea I had

1  Mr. Breslow fax to me what their position on the guidelines
2  was.
3          Now, normally, in a case it is very rare that you
4  have a stipulated guideline range between parties.
5          THE COURT:  Where is that?  Does someone have that
6  cooperation agreement?
7          MR. ABENSOHN:  I have the agreement, Your Honor.
8          I believe counsel --
9          THE COURT:  Are the letter and the agreement the
10 same on the guidelines?
11         MR. LICHTMAN:  It wasn't a letter.  It was actually
12 just a fax with the --
13         THE COURT:  Are they the same as what's in the
14 cooperation agreement?
15         MR. LICHTMAN:  Yes.
16         But understand this, that the government did not, in
17 fairness to the government, they didn't come out and say this
18 is what we believe the range is.  They said the defendant
19 stipulates to the following adjustments.
20         So, in essence, I suppose, there very well may have
21 been a confusion.  The government obviously missed these
22 points at the time, based on the item they faxed to me with
23 what they believe the guidelines to be as attached to my
24 October 10th letter.
25         My belief was based on the fact that he was

1    stipulating to certain adjustments, that that was the end all

2    and the be all and it was confirmed to me by the government's

3    fax of that same day.

4          Then I find out in June of this year that four

5    points suddenly come from nowhere.  I can't argue the factual

6    basis for certainly the gun because I think it is appropriate.

7    That's why I mentioned that Judge Gleeson's decision about

8    guideline factor bargaining, the Gonzalez Bello (ph) case.

9          THE COURT:  What about that decision?

10         MR. LICHTMAN:  The judge said -- it's actually also

11   occurred in the Southern District with Judge Rakoff, where

12   sometimes --

13         THE COURT:  This doesn't say anything about -- it

14   doesn't have anything about guidelines in it, the cooperation

15   agreement.

16         MR. ABENSOHN:  I believe on the second page, Your

17   Honor, it stipulates to certain applications in the

18   guidelines, but certainly in the government's view, there is

19   nothing in there that purports to announce the government's

20   entire estimate.

21         MR. LICHTMAN:  I agree with that.

22         THE COURT:  But then you have some fax?

23         MR. LICHTMAN:  What I have is a fax which is

24   attached to my October 10th letter, Judge.  It is the last

25   page.  It is what the government estimated on the day of the

6

1  plea.  Those numbers reflect the stipulated -- the
2  stipulations in that section of the cooperation agreement that
3  Your Honor just read.  I can pass it up, Judge, if you like.
4       THE COURT:  You say it is at the end of your
5  October --
6       MR. LICHTMAN:  Yes, it was an enclosure.  The
7  October 10th, last page.
8       THE COURT:  I see.  I have it.
9       MR. LICHTMAN:  It is missing those four points.
10      THE COURT:  Which is the gun and the obstruction?
11      MR. LICHTMAN:  Exactly.
12      I suppose in hindsight the reason why I didn't push
13 too much to it put on the record at the plea about those four
14 points is because they didn't exist.  I would have been -- I
15 would have been have been hard pressed to imagine, or I
16 suppose I could have had them put on the record what they
17 believed the estimated guideline range was, but it was a 5K1
18 situation at that point and, frankly, that was not the tail
19 that was wagging our dog here, so to speak.
20      Again, I don't want Your Honor to think that I am
21 suggesting that the two levels for the firearm are not
22 appropriate because they are.
23      THE COURT:  Are you questioning the obstruction?
24      MR. LICHTMAN:  The government -- and the Probation
25 actually disagreed with the government on the first part of

1   the obstruction analysis, which was the lie the night of the
2   offense.  It's actually very similar to what Vasquez did the
3   moment they were met up in Queens when he said we are on a
4   wire.  That night Rachko, Detective Rachko was called by a cop
5   who taped the conversation and he lied to him about what he
6   was doing there.

7          Probation decided that was not worthy of an
8   obstruction adjustment, I suppose because it was still part of
9   the offense.  The government's more significant offer was the
10  money in a bag in the dumpster.

11         THE COURT:  Right.

12         MR. LICHTMAN:  While I suppose that could stand for
13  two-point obstruction adjustment, I also believe that it was
14  not the sort of obstruction that really impeded the
15  investigation, because literally two or three days later he's
16  proffering and telling them that there was money that he put
17  into a dumpster.  I don't see how it could have actually
18  obstructed anything when they weren't even aware of it until
19  he told them and he immediately gave it up during the first
20  proffer.

21         So I think those two points are a little shakier
22  than obviously the gun, and for that reason I had assumed that
23  it was not included in the cooperation agreement, any of the
24  stipulations, any of the adjustments.  It wasn't in the
25  government's fax to me on that morning.  It wasn't until June,

1  two years later -- none of the facts had changed.  All these
2  things existed at the moment we had pled guilty in June of
3  '04.

4         THE COURT:  But there wasn't a discussion about
5  this, that there -- you talk about bargaining.  This wasn't
6  something that was bargained over.  It was just something
7  presumably that Probation analyzed and was overlooked by the
8  government.  It wasn't as if the government said to you look,
9  we have looked at this and we don't think this is obstruction.

10        MR. LICHTMAN:  We didn't discuss those -- we didn't
11 discuss the gun point.  We didn't discuss the obstruction
12 points.

13        THE COURT:  It is like people missed it as an issue.

14        MR. LICHTMAN:  I would say that people missed it.  I
15 think that's a much fairer analysis of it.

16        THE COURT:  So it is not like a bargain.  You are
17 talking about Judge Gleeson and Rakoff decisions where people
18 bargained over things.  It wasn't as if you had a discussion
19 with the government and they said look, we don't think we can
20 prove this.

21        MR. LICHTMAN:  That being said, what the whole point
22 in my mind at the time that we did the cooperation agreement
23 was that they -- I believed, frankly, at the time that he
24 deserved two points for the gun.  I didn't think about the
25 obstruction, to be completely frank.

1    I thought they were giving me -- sometimes what

2  happens in cases is you will get an offer from the government.

3  This is the offer we are giving you. And you don't start

4  saying, don't you think you want to add two points here or two

5  points there. They are giving me an offer that's going to

6  prevent him from having a life set of guidelines. So my

7  belief was they were saying this is what we are giving you.

8  My position is, hey, we will take it.

9    I don't see those two points for the gun in it. The

10  obstruction, again I will add, that I didn't believe it was an

11  obstruction and it didn't enter into my thinking. While we

12  didn't have an overt discussion, there was an offer made. I

13  accepted it. I confirmed it on the morning of because,

14  frankly, I was concerned about the two points for the gun

15  getting me ever closer to life on a guidelines.

16    And in an unusual thing, I don't think I've ever

17  done on the morning of a plea, I had them fax to me what they

18  believed the guidelines were because I didn't want to be here

19  two years later fighting about. Frankly, I thought it would

20  just be those two points for the gun.

21    THE COURT: What is your position, that the

22  government is bound by this? That they can't take a different

23  position? They seem to be taking a different position.

24    MR. LICHTMAN: They are now.

25    THE COURT: Is your claim that they are somehow

1  bound by this not to take a different position?

2              MR. LICHTMAN:  I don't think they are bound, Judge.

3         I don't want to play this too hard.  I will tell you

4  the reason why I am making it an issue at all.  Because of the

5  existence of the 5K1, in essence it could be mooted.  This is

6  what troubles me.  When I -- this is not a situation where --

7  I am talking about Vasquez only.  When I talk about the

8  analysis that we did as lawyers and -- for the government and

9  also for the defendants, Vasquez and Rachko were the people

10 that were on the same level.  I am not talking about McGuire.

11 His situation was obviously much more less significant and

12 also Rodriguez.

13        It was always our belief that the two men were very

14 equal in terms of what they had done in this scheme.  Rachko

15 had had certain confidential informants that had given him

16 information.  Vasquez had the drug dealers that he was selling

17 the drugs that they stole and then put back on the street.

18 Vasquez had taken the cash and distributed it.  In fact,

19 Vasquez received more.  Rachko had his piece that he did.

20 Vasquez had his piece that he did.  They each had their own

21 resources to effectuate this scheme.  Vasquez did things on

22 his own.  Rachko did things on his own.  It wasn't like there

23 was some kind of organized crime enterprise put together.

24 These were guys, when they had the opportunity they did it.

25        The point being, the reason why I am bringing this

 1   up at all is that if you go based on the guidelines that the
 2   government offers now, we are coming from life for Rachko and
 3   we are going from 18 years for Vasquez and I guess supposedly
 4   the -- the 3553(a)(6) factor about the sentences should not
 5   have a great disparity between people that are convicted of
 6   the same crime and situated in the same way, it gave me the
 7   impression from reading the Vasquez minutes that Your Honor
 8   was under the impression that there was a hierarchy and the
 9   guidelines that the government was offering up were not
10   helping my position, which is why the letter came in so late,
11   frankly.  I didn't know that I was going to be making this
12   application.

13           THE COURT:  The guidelines were always different.
14   Mr. Vasquez's guidelines were always less.

15           MR. LICHTMAN:  It was two points less.

16           THE COURT:  I don't recall them right now.

17           MR. ABENSOHN:  I don't remember the number offhand,
18   Your Honor.  I think the only difference was he did not have
19   points for obstruction, and as far as the current arguments,
20   he did not have leadership points.  It was a six-point swing
21   in all.

22           THE COURT:  That's a pretty big swing.

23           MR. LICHTMAN:  I will tell you why it wasn't a six
24   point swing.

25           THE COURT:  Ms. Holley, please.  Excuse me.

12

1            (Pause.)

2            MR. ABENSOHN:   Your Honor, I do have a copy of the

3    PSR for Vasquez.

4            MR. LICHTMAN:   It was my understanding, and based on

5    the record from reading Vasquez, that his guideline, the

6    bottom range was 18 years.   I wasn't privy to his cooperation

7    agreement for obvious reasons, but in my discussions with

8    lawyers for Vasquez, I was led to believe that he was around

9    20 years.   I was around 20 years as well, two years above.   He

10   was two years below.

11           While I didn't pin down Vasquez's lawyer and ask him

12   for a copy of the cooperation agreement, I believed they

13   were -- we were both around the twenty-year range before the

14   5K1 kicked in.   I was unaware until the other day that there

15   was a four-point upward adjustment for role that the

16   government and I had stipulated to and I had done it simply

17   because I thought that Vasquez had gotten the same four

18   points.

19           MR. ABENSOHN:   Your Honor, Officer Vasquez's

20   calculation was 37 points, which was a 210 to 262 recommended

21   range under the guidelines.

22           MR. LICHTMAN:   Which is about 18 and change years.

23           When we made the cooperation agreement, the plea, we

24   were looking at 22 years as the bottom for Rachko and now

25   suddenly I am looking at life and I think what it does is it

1   presents an incorrect factual hierarchy before I even walk
2   into this courtroom.

3   Your Honor, based on the -- on the comments that you
4   have made in the last two sentences, I think you have been
5   mistakenly led to believe that Rachko was somehow the
6   organizer and leader and is the main guy and Vasquez is
7   slotted below.  That's why I put this in so late.  I wasn't
8   prepared to -- I was shocked by the minutes of Vasquez's
9   sentence when I find out that suddenly everybody is pointing
10  to this as the bad guy.

11  It made no sense to me because, again, as I said,
12  Vasquez was in charge of selling the drugs.  Rachko never even
13  met the drug dealers.  He was in charge of distributing the
14  money.  The day of the arrest, or the day of the incident, he
15  gave the bag to Vasquez of money and said stash it.  It
16  doesn't sound like a follower to me.  It sounds like somebody
17  who is a leader as well.

18  In fairness to the government, he was the one that
19  initially brought Detective Rodriguez into it.  He was the one
20  that had the confidential informants, but Vasquez had his own
21  confidential informants as well because he did his own drug
22  rips without Rachko even being present.

23  So I always assumed, in fact, frankly, to be
24  completely blunt, until the day of Vasquez's sentence I
25  believed that Vasquez was the bad guy because he was the one

1   that was selling the drugs and putting them back on the

2   street.   Lo and behold, I read the record and that's why the

3   letter came in so late.

4                   THE COURT:   What is the government's position?

5                   MR. ABENSOHN:   Your Honor, I guess there a number of

6   points to address.

7                   First of all, counsel is correct, that the estimate

8   that was provided to him around the time of the sentencing

9   reflects a different range than here.   What happened was, the

10  government subsequently wrote to Probation requesting these

11  additional enhancements, the gun and the obstruction, which

12  had a factual basis.   As I stand here today, that's obviously

13  the government's position, given its prior correspondence with

14  Probation and Probation's addendum.

15                  I do want to make clear that while the fax estimate

16  certainly didn't purport to be binding on the government, and

17  while it certainly is appropriate in the government's view,

18  that it advises the Court as to what it currently believes is

19  the correct calculation, defense counsel in my view it's

20  legitimate that to some extent he might have relied on that

21  estimate in negotiation and in entering the plea.

22                  I am in somewhat of an awkward position.   The

23  correct calculation in the government's view is the one before

24  the Court.   Undoubtedly, to some extent counsel, relied on the

25  estimate that was given at the time of sentencings.   The

1   government is not bound by that estimate.  It wasn't the
2   correct estimate.  But to the extent the Court wants to take
3   that into some consideration in deciding an appropriate
4   sentence, the government doesn't have an objection to it.

5           With respect to the question of obstruction and the
6   gun, I think yes, plainly the gun enhancement applies as a
7   factual matter, although defense counsel I think is somewhat
8   unclear on this.  I think it's at least equally clear as the
9   obstruction applies.  Once he understood that he was being
10  pursued by IAB and potentially other investigators, the
11  defendant took a number of steps to conceal the funds that
12  were involved in that bad rip.  In the government's view that
13  plainly warrants the two point enhancement.

14          With respect to this comparison between Officer
15  Vasquez and Officer Rachko, at the outset defense did
16  stipulate to a four-point leadership increase.  At least at
17  some point in this process it was the defendant's recognized
18  understanding that he warranted those points.

19          MR. LICHTMAN:  I still do.  I don't mean to
20  interrupt.  I think he does merit the four points.  I think
21  Vasquez did as well and they should be compared similarly.

22          MR. ABENSOHN:  With respect to that point, Your
23  Honor, I think there were a number of reasons the government
24  viewed it differently.  It is true, that Officer Vasquez had a
25  primary contact who was responsible for selling the drugs.

1  As the government understood this case, over time though

2  Officer Rachko was much more the engine towards initiating

3  these various transactions.  He had ostensibly a stable of

4  CI's that he oversaw for purposes of gathering information to

5  make these transactions possible; essentially recruited

6  Officer Rodriguez to make one of these transactions;

7  essentially put Officer McGuire together with Officer Vasquez

8  for another series of transactions.

9        So there were a number of reasons I think that the

10  government considered appropriate to include a four-point

11  enhancement as to Officer Rachko.  That said, I don't think

12  necessarily -- you know, I don't know the right word -- as a

13  moral matter, as a quantitative matter I don't think

14  necessarily Officer Rachko was that much worse than Officer

15  Vasquez.  But I think as a technical matter, under application

16  of the guidelines, the four-point enhancement is appropriate

17  in this case.

18        MR. LICHTMAN:  Your Honor --

19        THE COURT:  Why wasn't it appropriate in Vasquez's

20  case?

21        MR. ABENSOHN:  I think the notion was, Your Honor,

22  that Officer Vasquez's primary outside contact here was a drug

23  dealer and that he didn't really have a leadership role per

24  that dealer but was essentially handing over drugs to someone

25  who has a resource and would then be able to sell them.

1       I understand it is an imperfect response because

2   Officer Vasquez at least had had a small number of CI's, much

3   smaller than this defendant, but nevertheless a small number

4   of CI's that he obtained information from.

5       I think the biggest distinction, frankly, are the

6   number of CI's and also the extent to which Officer Rachko

7   involved other officers, both in particular transactions and

8   with one another.

9       All that said, Your Honor, I don't have a perfect

10  response as to why a different decision was made with respect

11  to Officer Vasquez.  There were substantial differences.

12      THE COURT:  Except you are stating on the record,

13  based on your analysis of the evidence, that Mr. Rachko had

14  some form of managerial role by bringing Rodriguez in and by

15  organizing things in terms of him appointing informants to

16  bring the drugs.

17      MR. ABENSOHN:  Identifying opportunities, overseeing

18  a stable of CI's, putting different officers together with one

19  another.  That separates him from Officer Vasquez.

20      Again, that said, I don't mean to suggest that his

21  conduct was substantially worse in some sort of moral sense

22  than what Officer Vasquez did.

23      THE COURT:  The role in the offense?  Where is that?

24      PROBATION OFFICER:  3B1.1?  Is that -- page 324,

25  Your Honor.

1       THE COURT:  I don't see any way around the

2  application of the guideline.  It seems, reading it, it's

3  appropriate.

4       MR. LICHTMAN:  The four points for Rachko?

5       THE COURT:  Yes.

6       You didn't challenge it.

7       MR. LICHTMAN:  I don't contest it.  I stipulated to

8  it back then.  I think he deserves it.

9       But reading the guideline, five or more

10  participants, a leader or organizer, exactly what Vasquez did

11  as well.  For him to not even have a two-point adjustment -- I

12  don't blame this Assistant.  He was not involved with this at

13  all.  It's incredible for -- he had his own drug rings.  He

14  had his own stable of CI's.

15       THE COURT:  We are not here to reargue the

16  sentencing of Mr. Vasquez.  If there was a mistake and the

17  government didn't take the correct position with Mr. Vasquez,

18  I guess that's too late and done with.

19       MR. LICHTMAN:  Understood.

20       My only point to it, which is why I agreed to the

21  four points, is that the difference, because the government

22  did not give Vasquez a single upward adjustment for role and

23  the four points he received, is from 20 years to life.  It's a

24  significant difference.  Just simply based on 3553(a)(6),

25  there is a humongous disparity in potential exposure under the

1  guidelines that the government agrees with is unfair at this

2  late stage.

3          THE COURT:   How is that inequity dealt with?  If in

4  fact the guidelines on a strict guideline calculation come out

5  to what the government now contends is life, is your client

6  seeking his plea back?

7          MR. LICHTMAN:   No, Judge.

8          I am not convinced that the two points for

9  obstruction is warranted based on the money in the dumpster.

10  I am not going to challenge the two points for the gun.

11  Frankly, if it wasn't for the fact that we were at life --

12          THE COURT:   I think McGuire got the two points.

13          MR. LICHTMAN:   He did.

14          THE COURT:   Rachko was equally involved.

15          MR. LICHTMAN:   I agree.  I am taking the two points,

16  the two points for the -

17          MR. ABENSOHN:   To clarify, Your Honor, I don't

18  believe the Court gave two points to Officer McGuire.

19          THE COURT:   I'm sorry.  I didn't.  You are

20  absolutely correct.

21          It was because I found it was more than offense

22  conduct that he was involved in and because I held him

23  accountable for that extra money that hadn't otherwise been

24  accounted.

25          I'm sorry.

1         MR. LICHTMAN:   I don't want to belabor these two
2   points for obstruction.   The reason why they are so critical
3   is because we are coming from life to not life, if those two
4   points stick.   They weren't included in the estimate on the
5   day of -- I suppose -- in equity how can we deal with it?
6   Factually, I suppose Your Honor could find those two points
7   are applicable.   Immediately, as soon as the arrest occurred,
8   he was debriefed and indicated to the government that the
9   money was put in the dumpster by him.   I don't see how that
10  could have possibly slowed up this investigation because he
11  cleared it up almost instantly.   That's my only -- I know it's
12  a thin reed but because of the situation that I am in, it's
13  all that I have.

14        THE COURT:   What is the government's position?

15        MR. ABENSOHN:   Your Honor, it's a very thin reed.
16  He came forward with that information once he was arrested.
17  Obviously, his conduct in trying to secrete that money was to
18  avoid arrest.   So I really -- I don't see a viable factual
19  argument not to include those two points.

20        That said, the final calculation does strike me as
21  perhaps a greater disparity than in fact ought to exist in
22  some sense between Officers Rachko and Vasquez; but on a
23  strict guideline basis, I don't see how those two points
24  aren't included.

25        THE COURT:   How does it impact the Court's departure

1  power?

2          MR. ABENSOHN:  Your Honor, I think obviously the
3  guidelines -- they are something the Court will and must take
4  into consideration.  But in light of 5K here, I think the
5  Court has obviously broader discretion than it would
6  ordinarily to arrive at its view of a reasonable sentence
7  here.

8          It is not the government's policy to recommend any
9  particular sentence.  I am doing the best I can to articulate
10  the reasons that in certain senses Officer Rachko had more
11  responsibility in this.  He was more the engine behind it.
12  But I am also trying to alert the Court to various reasons
13  that in other senses their conduct is really very comparable.

14          Beyond that, I think it falls to the Court to use
15  that information at arriving at some reasonable sentence which
16  may well be below that guideline range.

17          THE COURT:  Well, I don't know that there is any
18  principled way to apply these guidelines other than in the way
19  that the Probation Department has applied them, which is, I
20  believe, Mr. Gjelaj, it's the 43?  It would be life?

21          PROBATION OFFICER:  That is correct, Your Honor.

22          THE COURT:  That occurs principally because of what
23  has been described here as a leadership role.

24          I think under all the circumstances that the
25  government points out that this may be a situation where

1  Mr. Rachko vis-a-vis Mr. Vasquez and their conduct that may

2  unduly magnify the difference, although I think there is a

3  distinction between the two defendants that may unduly magnify

4  it.  I believe that Mr. Vasquez's guidelines were 210 to 262.

5          MR. LICHTMAN:  He wasn't hit with the two points for

6  obstruction, Your Honor.  That was the only difference.

7          In my mind, I believe that we lost those two points

8  because of the money in the dumpster.  I assumed Vasquez had

9  the four points for leadership role which is why I stipulated

10  to it two years ago.  I can't be privy to everybody's

11  cooperation agreement.  It's all secret.

12          THE COURT:  I know.  That's not the point.

13          I take it, the government stands by their position,

14  that Mr. Vasquez didn't have a leadership role?

15          MR. ABENSOHN:  That was -- that was the government's

16  position with Probation and yes, the government stands by that

17  position, because of the different circumstances I have

18  described, Your Honor, concerning oversight of multiple CI's.

19          THE COURT:  All right.  I think his conduct was

20  clearly obstruction.  The phone calls dealing with the money,

21  the asking Mr. McGuire to get it, I think that that was all --

22  suggests that there was an obstruction.  There was no

23  challenge to the role in the offense.  The facts aren't

24  different simply because someone else got a different

25  assessment.  They are what they are and they weren't

1  challenged at the time.

2      MR. LICHTMAN:  Judge, they are -- they are only

3  significant in the fact that you are now slotting the two

4  defendants perhaps based on the government's, what I believe

5  to be, a faulty position then and perhaps they are bound by it

6  now, that although Vasquez sold the drugs unilaterally, had

7  his own CI's, that he used to commit drug rips, enlisted other

8  cops on his own without Rachko even knowing, somehow he

9  doesn't merit four points.  He doesn't merit --

10      THE COURT:  Enlisted what other cops?.

11      MR. LICHTMAN:  He used Rodriguez on his own without

12  Rachko even knowing.

13      THE COURT:  Wait a minute.

14      I heard a moment ago that it was this defendant who

15  recruited Rodriguez.

16      MR. LICHTMAN:  The first time.  Vasquez on his own,

17  once Rodriguez was involved, Vasquez used the other cops

18  without telling Rachko at all.

19      There is a reason why Vasquez had to give up more

20  money.  It is because he received more money because he stole

21  more money.  He was doing things that Rachko wasn't even aware

22  of.  So I don't see how in terms of slotting -- I am not

23  disagreeing that he merits the four points.  I am not here to

24  reargue Vasquez's sentence.  I am just here simply to suggest

25  that if you are slotting them, I think that this is a mistaken

1  factual premise that I have walked into before the sentence
2  even started.

3        It's almost unimaginable that the man who sells the
4  drugs, uses cops on his own, uses CI's on his own to do these
5  drug rips, doesn't receive the four-level adjustment or even a
6  two-level adjustment.  I think it was a mistake by the
7  government.  I understand the prosecutor today is bound by
8  what his predecessor has done.  I don't think it is fair and I
9  don't think it is accurate.

10       I am afraid that Your Honor is going to unfairly
11 penalize him because the government is unwilling to back off a
12 mistaken position now, with all respect to this prosecutor
13 because it is not his fault.

14       THE COURT:  If I made a mistake, or if the
15 prosecution caused you taking your position, I am not
16 validating this position.  If the prosecution caused the
17 government to -- I mean, the government caused the Court in
18 your view to make a mistake as to Mr. Vasquez, I guess that's
19 something that's over and done with.  It doesn't mean that
20 Mr. Rachko isn't liable for the conduct that he did.

21       MR. LICHTMAN:  Right.  I just think that it's
22 unfair.

23       THE COURT:  It may be unfortunate if that's your
24 viewpoint but it doesn't mean that Mr. Rachko can't --
25 shouldn't be held accountable for what he did.

1           MR. LICHTMAN:  He absolutely should be.

2           I just think that in terms of the 3553(a)(6) factor,

3    that it should be taken into account, that perhaps a mistake

4    was made.  I didn't have the opportunity to come in here the

5    other day.  I just had to read it after the fact.

6           THE COURT:  What would you have done?  Stood there

7    and said, Judge, I think you should treat Mr. Vasquez -- give

8    him a higher sentence?

9           MR. LICHTMAN:  In a perfect world, we would all the

10   sentences on the same day.  It could have been hashed out

11   among us.

12          THE COURT:  I would have been perfectly willing to

13   have all the sentences on the same day.  Somebody made that

14   request.  I don't know that anybody did.

15          MR. LICHTMAN:  I didn't know there was an issue

16   until after Vasquez was done, Your Honor, and I read the

17   minutes, to be honest.

18          It is an imperfect situation, as the prosecutor

19   says.  He is right.  I just think that what's fair is fair.  I

20   don't want him to be unfairly punished because of a prior

21   mistake by the government.  Now they are stuck with this

22   slotting which I think is inappropriate.

23          MR. ABENSOHN:  Your Honor, just to clarify one

24   point.  I think defense counsel might have misspoke or been

25   mistaken.  Officer Vasquez did not have involvement with

1    Officer Rodriguez.  That was an officer that Officer Rachko

2    did in fact recruit, and so far as we are aware, is the only

3    officer to have done a deal with him.

4               MR. LICHTMAN:  It was Officer Wolf, Judge.  I'm

5    sorry.  I did misspeak.  It wasn't Rodriguez.  He had used

6    Wolf without Rachko's knowledge, to do his own drug rips.

7               THE COURT:  All right.  Do you want to be heard?

8               MR. LICHTMAN:  Yes, Your Honor.

9               We are going to assume then the guidelines are life

10   going forward?

11              THE COURT:  I think that that is the principle

12   application of the guidelines.  I understand your frustration

13   and that's why I asked you whether Mr. Rachko wanted to

14   withdraw his plea, if he came here thinking that there would

15   have been a very different calculation, but I take it he

16   doesn't want to do that.

17              MR. LICHTMAN:  Judge, we are happy with the way the

18   government treated him and he -- he's guilty.  So we are in no

19   position to -- because of perhaps a mistake, to ask for the

20   plea back for -- I guess for reasons of leverage or

21   bargaining.

22              THE COURT:  All right.

23              MR. LICHTMAN:  Thank you for the offer.

24              THE COURT:  Okay.

25              MR. LICHTMAN:  If I can just be heard generally,

1  Judge?   Then Mr. Rachko will speak.

2         Now that we've gotten past all this, you have read

3  the submission.  Your Honor received my March 7th submission

4  as well as the one from October 10th, obviously.  You have

5  read the letters.

6         I think that it's almost unthinkable that we are

7  here today Tom Rachko for the crimes that he has been charged

8  with and convicted of.

9         The courtroom, as you can see, is filled with people

10  that love him and care about him and support him.  We have

11  read in the letters that he is a great father, a great asset

12  to the community.

13         Mr. Rachko will address the Court at some point and

14  try to make some sense of this, but I have tried as a defense

15  lawyer to try to understand how a guy who seemingly is a

16  decent, giving man, could end up here today.

17         It wasn't for greed, which is what I think Your

18  Honor would immediately assume that it was about.  This is not

19  a greedy man.  He lives in a small apartment.  He drives an

20  old car.  He has no assets to speak of.

21         THE COURT:  That's because he gambled them away.

22         MR. LICHTMAN:  Exactly.

23         THE COURT:  If you are taking money for whatever

24  purpose, why isn't it greed?

25         MR. LICHTMAN:  I think that -- I don't think -- I

1   think it might have actually been worse than greed, if Your

2   Honor would let me go on a little bit.

3            I think that the gambling problem that he had,

4   obviously it wasn't the cause of this, but I think it maybe

5   exacerbated the amount of times that he did this because he

6   needed the money to gamble.  When I consider greed, I think of

7   people hoarding money and buying things, assets, to stack up.

8   He was taking the money and just blowing the money the next

9   day.  I don't consider that necessarily a greed based crime.

10  I think --

11           THE COURT:  I guess if he had won, you'd have viewed

12  it as a greed based crime?  He was taking the money to

13  presumably try and make other money.

14           MR. LICHTMAN:  I suppose.

15           THE COURT:  He just lost.

16           MR. LICHTMAN:  I don't think people gamble because

17  of greed, is my point, I suppose.  I think that there is

18  something compulsive inside them that makes them do this.  I

19  don't think it is with the hope of being greedy.

20           The only rational explanation that I can really come

21  up with as to why this happened, and I think it's something

22  that really isn't talked about enough, in his job, the place

23  that he was working, the type of stuff that he was doing, was

24  in the worst parts of New York City.  He was dealing with the

25  lowest of low elements.  He was witnessing violence, drug

1 dealing; the absolute bottom of the barrel, the worst parts of
2 New York City.

3          I think at some point along the line, obviously
4 something triggered in him and he became one of them, in
5 essence.  Perhaps he wasn't strong enough.  It's a very tough
6 job.  Not everybody can do this kind of work.  He was beaten
7 down by this work.  Eventually something happened that caused
8 him to become one of them and he had crossed the line.

9          We've got letters from ex-prosecutors that I have
10 submitted and defense lawyers, and everybody basically says
11 the same thing.  This was a fair and decent detective.

12          We learned that he was a tireless volunteer at
13 Ground Zero.  We hear about how he's given to the children in
14 his community.  We hear about how well adjusted his kids are
15 and what a big part of their lives he is.  We read about the
16 work that he is doing in the sports programs in his community
17 and how he's taking care of the fields.

18          These are not the actions -- all this stuff
19 occurred, really started, before he was even arrested.  So
20 it's really hard to make any sense of this.

21          I can tell you one thing though, that this is not
22 the type of person that normally ends up in front of a judge
23 like yourself for a crime like this.  I think we can agree
24 upon that.

25          I don't mean to personalize this because I -- I

1   think it's somewhat inappropriate, but there is sort of a joke
2   that defense lawyers amongst themselves, sometimes ruefully
3   about their clients.  What if you get hit by a bus today and
4   get run over and killed, what are your clients going to think.
5   And the answer is, "Well, isn't that sad what happened to
6   Jeff.  Now who is going to represent us going forward?"  They
7   will shed a tear for a minute.

8        Tom Rachko really is not that kind of person.  I can
9   say this with personal observation.  As a defense lawyer, we
10  also are human.  We have parts of our lives that sometimes our
11  clients are exposed to.  I had twin boys that were born ten
12  weeks prematurely two years ago, in the hospital for 63 days.
13  I have 30 clients perhaps, perhaps more, at any time.
14  Everybody knew what was going on.  I had a very high profile
15  case in the Southern District that was going on while I'm in
16  the hospital every day.  I can think of one client who called
17  me or e-mailed me every single day to ask me how the kids
18  were.  Never once said to me how is my case going; never once
19  said to me, am I going to die in prison.  How are your kids
20  doing?  Did they gain any weight today?  They were born two
21  pounds.

22        He sent me a gift.  He doesn't have the money at
23  this point.  He gambled it all away.  He's living hand to
24  mouth, basically.  It showed me a human side to him that as a
25  defense lawyer oftentimes we just never see from our clients.

1  They are so wrapped up in their own problems, God forbid they

2  could even imagine anybody else in the world has an issue to

3  worry about.

4       I had clients I was getting ready to go to trial

5  with that were facing life in prison.  Your kids are okay,

6  great.  What about me?  It showed me the kind of person that

7  he is.

8       He deserves punishment, there is no question.

9  That's what we are here for today.  We are not going to

10  minimize his crimes.  But he also deserves some compassion.

11  He gives it to a lot of other people, as we see.

12       The people that came here today, this is an

13  extraordinary showing for any defendant.  I don't know that

14  we'll ever understand why he did it.  I hope perhaps he can

15  clear some of it up.

16       One of the issues that we talked about before I

17  started talking was the guidelines, and when you get to such a

18  high level every point matters, obviously, because each point

19  can be three or four years.  The two points that basically

20  pushed me over the top were the obstruction points.  It took

21  him from 20-something years to life.

22       I don't think that was -- it was hardly the tail

23  that wagged the conduct that Mr. Rachko was convicted of here,

24  but I think what's an important point to bring up, and it is

25  something that I have read in the minutes from Vasquez's

1   sentence and it was reported to me what occurred yesterday

2   with McGuire, is this whole issue -- and I think this

3   mitigates the two points for the obstruction -- is this blue

4   wall of silence.  Your Honor was led to believe over the last

5   two sentences that this -- there is no such thing as a blue

6   wall of silence in this case.  Everybody came in and started

7   to cooperate.  Yes, some blue wall of silence.  Everybody

8   rolled immediately.

9           It is just not true.  I put that in my letter of

10  October 10th.

11          Mr. Abensohn was not present from the beginning of

12  this case, obviously.  But the facts, the extra facts that

13  don't show up in a 302 or DD-5 or a DEA report were things

14  that were leaked to the newspapers, and also things that we

15  saw with our own eyes that I reported to Your Honor.  There is

16  a blue wall of silence.  It is alive and well in New York City

17  right now.  We saw it in the Abner Louima case, where with all

18  the people that witnessed everything inside this precinct, one

19  cop came forward to speak about what happened.  He was

20  vilified.  He was vilified for the rest of his days.  He has

21  been vilified since then for what he did.

22          I think that the law enforcement leaks in this case

23  are really extraordinary.  Not just for the fact that they

24  were unprofessional.  It happens in almost every high profile

25  case, there are leaks.  We had a situation where he came in

1    first.  We will go into that in a bit.  We are sitting in the

2    room with the creme de la creme, with each New York City and

3    federal agency, to hear debriefings about the biggest police

4    corruption scandal perhaps in a generation.

5         The moment that we leave those -- that room during

6    each proffer, the next day word for word it was in the

7    newspaper.

8         During my debriefing, the first one that I went

9    to -- I came in after the first one -- I was aghast because it

10   was changing his life in worse ways than it should have.  He

11   was told by the feds because he was receiving calls, people on

12   the street were yelling at him.  He was followed in the car.

13   They were taping things to his front door.  He has two small

14   kids.  He was told, change your pattern with your kids.  Don't

15   let them walk home the same way.  There could be harm.  This

16   is the kind of stuff that was going on.

17        When I came into the case, I was in a room filled

18   with perhaps 20 agents, detectives, prosecutors from the

19   state, from the federal government.  I said look, before we do

20   anything today, you guys have got to realize what you are

21   doing.  You are killing this guy.  Stop the leaks.

22        I asked Mr. Breslow, would you please make this --

23   perhaps give it a -- some grand jury secrecy protection so if

24   they leak any of this there could be a crime.  No.  I trust

25   the people in this room.  It won't happen again.  I have

34

1   spoken to everyone of them.

2          The next day, word for word was recounted in the

3   newspaper about what happened in that room.

4          My point is, is that making the move to cooperate

5   first while every lawyer that comes in here -- I am amazed,

6   frankly, having read the transcripts from the other day and

7   learning what happened yesterday, they will say anything, I

8   think.   Unless they are stopped, they will say anything.

9          THE COURT:   Who will?

10         MR. LICHTMAN:   I think lawyers sometimes will say

11  anything, or they will listen to things being said if they

12  help them and they won't stop it when I think they know that

13  perhaps it is not entirely accurate.

14         I will tell you what I am talking about.

15         THE COURT:   Defense lawyers do that, Mr. Lichtman?

16         MR. LICHTMAN:   Not me, Judge.

17         THE COURT:   Oh.

18         MR. LICHTMAN:   Luckily -- judge, the reason why I

19  think that I can come in here and say these things with the

20  utmost sincerity and believability is that, luckily, there

21  were so many leaks.

22         THE COURT:   It works in your favor this time.

23         MR. LICHTMAN:   It does work in my favor this time,

24  Judge.   I've never been in front of, and never misrepresented

25  facts, and I never will.

GR      OCR      CM      CRR      CSR

1          I think that the papers, the leaks, make it clear

2    that Tom Rachko made the decision first to cooperate.  I laid

3    out the scenario as to how it was shown, where the first

4    proffer was December 3rd.  I showed the prosecutor before we

5    came up here that the proffer agreement initially was dated

6    December 1st.  There were calls made at the end of November to

7    have him come in.  He was debriefed before the arraignment

8    even occurred in the federal case.  All this is reported in

9    the papers, by the way.  I noted it.

10         After the arraignment, Vasquez and Rachko are

11   brought into a separate empty courtroom with their lawyers.

12   Steve Breslow says to Vasquez, you'd better come and

13   cooperate.  People are already talking.  Making it clear that

14   it was Rachko.

15         The next day it's reported in the paper that Vasquez

16   was offered the opportunity to cooperate and he didn't take

17   it.  Rachko is already talking.

18         I have confirmed having spoken to Vasquez's lawyer

19   that the reason he ultimately decided to cooperate was because

20   he knew that Rachko had -- was going to testify against him.

21   This was a big deal.

22         I am only making this such a significant point

23   because I think Your Honor was misled to think that this was

24   not such a big deal.  They all came in together.  I think Your

25   Honor thought that perhaps McGuire even came in at the same

1  time.  McGuire's name was learned from Rachko's debriefing.

2         My point is this.  Making the determination to break

3  the blue wall of silence, so to speak, I think certainly

4  mitigates the two points for obstruction.  He received three

5  points for acceptance of responsibility.

6         Judge, you are looking at me like I am trying to

7  sell you a used car.

8         THE COURT:  No, I am not.  I want to find out from

9  the government, because I -- I want to hear their response to

10  what you are saying.

11         MR. LICHTMAN:  I apologize.

12         THE COURT:  I am not incredulous at all about what

13  you are saying.  I want to hear about what the government has

14  to say about that.  I think it was sort of presented as if it

15  was  simultaneous, everybody came in and cooperated.  If

16  that's a misimpression, I want it corrected.

17         MR. LICHTMAN:  It is a misimpression and it's

18  verified by not only the newspapers and the leaks, it will be

19  verified, if Your Honor wants a hearing, with -- Julio Vasquez

20  will come in and say it.  He has no love lost for Tom Rachko,

21  I can assure you.  But his lawyers assured me that he would

22  come in and clear that up.

23         It even said in the paper on December 9th of '03

24  that Rachko had implicated a retired lieutenant, McGuire, and

25  two other detectives, Rodriguez and Vasquez.  Vasquez didn't

1  come in until three days even after that article hit the
2  paper.

3        If the government wants to clear that up, I just
4  think that's such an important point and it -- it merits
5  something more than just a passing nod.  It is a very big deal
6  for them to cooperate.  Had they all kept their mouth shut,
7  and Mr. Franz eloquently said this during the sentence last
8  week, if they'd all just kept their mouths, we'd all be
9  looking at guidelines to perhaps 27 to 33 months.

10        I wasn't his lawyer then.  Perhaps I would have
11  advised him differently, but he made a decision.  He was going
12  in to cooperate.  His cooperation -- and Mr. Abensohn
13  confirmed it the other day -- is what drives these guidelines
14  up to life.

15        THE COURT:  That was true with all of the
16  defendants.  Their own admissions -- they admitted to a great
17  deal of conduct that, as I understand it, the government
18  couldn't have known about and didn't know about, which greatly
19  elevated their guidelines.

20        MR. LICHTMAN:  But there is nothing in the
21  guidelines that reflects when a cop in a scandal such as this
22  would come forward and implicate other cops first and make it
23  known to the world through the leaks and the suffering that he
24  had, on top of what he's dealing with today, the calls and the
25  threats and the following in the cars that nobody else in this

1   case had because he was first.  For a ten or eleven day

2   period, there was one cooperator in this case as reported by

3   the press.  Unfortunately, that was accurate.

4           I am just saying, it's a very significant point.  If

5   Mr. Abensohn thinks that I am misspeaking, I suppose --

6           THE COURT:  What is your position on that,

7   Mr. Abensohn?

8           MR. ABENSOHN:  Your Honor, I guess there are sort of

9   two aspects to this.  Once the case went federal, once

10  everyone was brought in, and I think it was December 3rd, on

11  these charges, effectively the dominos fell very quickly.  The

12  defendants either spoke with or indicated that they were

13  prepared to speak with the government.

14          When I received defense counsel's letter, I wanted

15  to be precise with the Court and actually spoke with the DA's

16  office, inquired about the actual arresting officers on the

17  state side who had become involved four or five days before it

18  went federal.  Basically, what I learned is immediately on

19  arrest, on I think it was November 26th or 27th, Officer

20  Rachko did signal an intention to cooperate.  He didn't yet

21  have counsel.  He wasn't prepared yet to sit down, but he did

22  signal an intention to cooperate.

23          During that same time frame, Officer Vasquez gave no

24  intention -- no indication that he did intend to cooperate,

25  and gave some indication that it was his understanding that

1  Officer Rachko had essential flipped on him.

2  So when I say that everyone essentially gave
3  information in the same time frame, that's really from the day
4  of the federal arraignment going forward, when our office
5  became closely involved in the matter.

6  I do think it is fair to say that in the days
7  leading up to that, when a lot was happening and a lot of
8  different agencies and officers were involved, it was Officer
9  Rachko who gave the first indication he'd come forward, and
10 that may well have influenced Officer Vasquez to go in the
11 same direction, which by the day of arraignment federally was
12 already clear via our discussions with his counsel.

13 THE COURT:  As I said before, the letters read as if
14 everybody is responsible for everybody else's --

15 MR. ABENSOHN:  Your Honor --

16 THE COURT:  -- decision to plead guilty.

17 MR. ABENSOHN:  I think that's correct in the sense
18 that once everyone came in, once everyone was with our agents,
19 with our Assistant, it was apparent that everyone was prepared
20 to talk.

21 Also, of course, cooperation and getting to a plea
22 is a period -- takes a period of months.  Things can move in
23 any direction over that time.  I think it is fair that
24 throughout that time there was pressure on all of these
25 defendants, given their understanding that others were

1  talking.

2       But to try and be as precise as possible with

3  respect to this defendant, it has been communicated to me by

4  the people involved at the state level that he was the first

5  to give indication of his intention, and that Officer Vasquez

6  by the time he came forward upon his federal arrest had given

7  the impression that he understood that Officer Rachko had

8  flipped on him.

9       THE COURT:  All right.

10      MR. LICHTMAN:  That's -- it is not -- it is a subtle

11  point but it is a significant one because without the

12  knowledge that Rachko was cooperating, who knows if we ever

13  have cooperation from Vasquez.  We don't know.  Who knows if

14  we ever have cooperation from McGuire, who was weeks later

15  apparently and was given up by Rachko.

16      It is a significant point, and I think what it does

17  is it evidences once Rachko realized what he did and had a

18  chance to step back, literally the day after he -- this

19  incident occurred in late November of '03 -- he changed his

20  life at that point and decided to come clean, do whatever he

21  was going to do regardless of whether he was going to receive

22  different legal counsel and he changed his life.

23      He immediately addressed his gambling addiction.  As

24  Your Honor has learned from the letters, he goes to Gamblers

25  Anonymous meetings many times during the month.  He meets with

1  a -- an additional counselor on a weekly basis to address the
2  gambling issues.

3          He's a stay-at-home dad.  He didn't just wallow for
4  the last three years waiting for this day.  He's a
5  stay-at-home dad who cares for his two kids while his wife
6  works.

7          As we learned in the 5K1 letter, he has been an
8  honest and good cooperator according to the government.

9          There was an issue, and that happened and, Your
10 Honor, I don't know if you ever were made aware until it was
11 perhaps in my letter in March, that initially the government
12 didn't believe that he was responsible, that he had actually
13 gambled the money away.  It's a lot of money to gamble away,
14 and that was holding up our ability to get a cooperation
15 agreement.

16         I have been doing this for 16 years.  I don't
17 represent many cooperators, Your Honor, but I can tell you
18 that what we did next, I've never seen as a defense lawyer
19 cross-examining a cooperator.  I said to Tom, well, why don't
20 we ask them, ask the FBI to administer a polygraph test.
21 Their office, let them do it.  And if you are lying, then you
22 are going to get life or something close to it and if you are
23 not lying then perhaps they will believe you.

24         Initially it was met with skepticism.  There was no
25 way we are ever going to polygraph a cooperator.  I could

1  imagine there are a number of reasons why the government

2  doesn't want to do that.  I pushed and pushed.  Eventually

3  they relented.  He was given a polygraph test at the FBI

4  headquarters and he passed.  The next day we had our

5  cooperation agreement.

6         It is a significant point because it shows the fact

7  that he was telling the truth.  He ws willing to take that

8  chance.  He could have relied on his lawyer to try to twist

9  the arm of the prosecutor to get the cooperation agreement

10  because he certainly was an important person, but he didn't.

11  He took it and he passed.

12         I don't mean to compare apples and oranges with

13  Vasquez but I feel like I am tied to with him before I come in

14  here based on what has been said over the past couple of days.

15  Vasquez failed the lie detector test regarding an allegation

16  of murder.  The government obviously doesn't have the proof to

17  believe that Vasquez was involved in this murder.

18         THE COURT:  The government told me that they didn't

19  believe based on their information that he was.

20         MR. LICHTMAN:  But they gave him a polygraph test

21  and he failed.  They obviously took that failure seriously

22  enough that they racheted up his bail conditions.  It had to

23  mean something at the time.  Otherwise, why bother and why

24  change his bail conditions.

25         I think, just to try to show you -- I know that you

1   are slotting them, Judge, the fact that he came in first, the

2   fact that he took a polygraph test --

3          THE COURT:   Every defendant obviously is judged

4   independently.   3553 factors apply individually, and each

5   defendant is unique.   You are correct, when you are

6   looking -- to some extent that when you are looking at an

7   overall pattern of conduct, that there are inevitable

8   comparisons in the roles that people play.   But each defendant

9   does stand before the Court as an individual.

10          MR. LICHTMAN:   I understand, Judge.   I appreciate

11   that.

12          I also mentioned in my last letter, I talked about

13   the post-offense rehabilitation, the efforts that he's made.

14   I mean, the letters really are tremendous.   The efforts that

15   he's made in his community are tremendous; the support that he

16   has now, despite the fact that he's in a community filled with

17   cops.   I know that this is not going the be the end all and

18   the be all, but I do believe, at least theoretically, all of

19   his post-offense actions would at least support a downward

20   departure for post-offense rehabilitation.   Again, obviously,

21   the 5K1 is what's going to rule the day here, but I think that

22   it is significant enough that at least merits some

23   consideration, that I don't know that many defendants have

24   that sort of application to make.

25          Judge, before Mr. Rachko speaks to the Court, I

44

1   wrote this in my letter.  I don't know how much weight you

2   will give this but it just struck me as unusual.  When I think

3   about organized crime cooperators that come in to court and

4   after killing two, three, nineteen people, and then they get

5   sentenced and the sentences are sometimes ludicrously

6   low -- the Gravano five-year sentence.  I can think of a case

7   I had where a Guy Zappolla committed a murder and received

8   thirty months.  As soon as he got out he killed his

9   girlfriend.

10          THE COURT:  That was someone you represented?

11          MR. LICHTMAN:  No.  It was a -- it was a defendant I

12  had cooperated against.

13          The cases are legion with cooperators.  There is a

14  cooperator testifying right now in the courthouse, Michael

15  DiLeonardo, who killed I think three or four people, received

16  bail after two years.  I don't think anybody believes that

17  he's ever actually going to go back into prison.

18          Anthony Rotundo is another one who killed I think

19  seven people and he spent two years in jail before he received

20  bail.  I don't think anybody thinks he is coming back.

21          The reason why -- it's not that the government or

22  judges love organized crime members.  The reason why they give

23  such significant breaks, I would imagine -- I am not a

24  judge -- is because they are giving up such significantly bad

25  people.  They are also taking a big risk by cooperating and

1   all that's reflected in these seemingly relatively lower

2   sentences.

3           Now, a cop that goes bad, other than a murderer,

4   frankly, I don't know that it could be worse.  I believe in my

5   heart that it's worse than the drug dealers themselves because

6   he's charged with upholding the most significant tenets of our

7   society.  If that's the case, that he is that bad, which is as

8   he should be looked at, I will be frank, the people that he

9   gave up, the fact that he came in first and opened this whole

10  investigation up should also be considered in the light the

11  way Your Honor would look at organized crime people that come

12  in.

13          The danger that he faces now in going to prison; he

14  has a target on his back every day that he is in prison.  I

15  don't even believe they allow him to be in general population

16  during any of the time that he is in prison as a detective who

17  is in jail, especially one who cooperated.

18          Mr. Rachko has not taken a life up like many of the

19  organized crime people that come before you.  The chances of

20  recidivism here are nil.

21          THE COURT:  I haven't sentenced any organized crime

22  figure to thirty months who has committed murder.

23          MR. LICHTMAN:  I am not suggesting you have.  I am

24  talking about judges in this building and across the river,

25  Judge.  It happens every day, many times.  I can think of

1   instances where people that have killed have gotten

2   thirty months or less, with a 5K1 letter.

3         The point is, I don't think he's worse the Mafia

4   killer who has never had a good day in his life.

5   Ninety-five percent of the time that he was out there, based

6   on the letters that you see, he was good cop.  He was doing

7   good things for society.  He was protecting society.  He was

8   risking his life for society.  The Mafia killer doesn't do a

9   thing for society but take, take, take, take, until the end.

10  When he cooperates, the reason he's cooperating is simply to

11  save himself and perhaps get out some day and, who knows,

12  maybe do it again.  The reason he cooperated is because he

13  knew what he did was wrong and he was willing to take his

14  medicine and here he is today.

15        I think that he has done a lot for society.  There

16  is a zero chance he will be back.  He took the first step to

17  cooperate before anybody else would.  He is suffering for it.

18  I would just ask Your Honor -- I know this is a tough case and

19  I know an incredibly difficult sentence -- I would just ask

20  you to look at some of the good.  He's a bad cop.  He's

21  disgraced his badge.  He has to live with that for the rest of

22  his life, but he's also done a lot of good in society.  I ask

23  Your Honor to reflect upon some of that before you are passing

24  sentence.

25        THE COURT:  Mr. Rachko, do you want to say anything

1   before the Court imposes sentence?

2            THE DEFENDANT:   Yes, Your Honor.

3            Good morning.

4            I would like to start by apologizing to the people

5   of the city and to the people of the State of New York, as

6   well as the New York City Police Department, for I know that

7   my terrible actions brought severe discredit upon the

8   department and myself.

9            I would also like to try to give some explanation as

10   to my actions.

11            I now have come to know in connection with my

12   therapy that I have been a compulsive gambler for probably the

13   last 30 or so years.  Many times having no money left two days

14   after pay day.  My gambling was secretive to my family and

15   eventually to my wife.  I found myself in tremendous debt.

16   When these opportunities presented themselves, after spending

17   many years doing what I consider a lot of very good cases in

18   the Southern District, I was placed in a position where those

19   cases did not seem to continue anymore, and when the

20   opportunity presented itself to take the money, I did not have

21   the mindset, I was so engrossed with my addiction to gambling,

22   that I felt I could take this money, I could pay my debts, and

23   I am finished.

24            All I did when I end ended up with more money is I

25   bet more money.  It just snowballed from there, until I lost

48

1    control.   Many times I didn't know where I was going.

2            My actions and my crimes -- again, which I know are

3    unbelievable in nature, and totally out of character for what

4    I was trained to do.   I just lost complete control of my mind

5    and continued to gamble.   Every time I got money, I gambled it

6    away right away.   And I now realize it wasn't so much to try

7    to have that big win.   I just wanted to gamble.   I wanted the

8    action.

9            My crimes, as terrible as they are, and my gambling

10   addiction, in early 2003, caused me to be separated from my

11   wife Sandy, an unwanted separation by myself.   It has placed a

12   tremendous burden on my family and my children and my

13   community.   And I would like also to apologize, which I have

14   done many times, to my community, several of those people who

15   are here in the audience, for my horrendous actions.

16           I do not use gambling as an excuse for what I did,

17   Your Honor.   I knew when I did what I did I was doing wrong

18   and I was breaking the law.   I just did not have the courage

19   or the proper mindset to stop, and I knew because of the fact

20   that for most of my years I was a good detective, I knew that

21   I was going to get caught.   But I just could not control

22   myself.   As soon as I received those funds, many times I

23   received those funds right outside a gambling institution and

24   I went right back in and gambled, just for the action.

25           Once I lost my wife, I gambled even more.   Now I had

1   not only the afternoons to gamble, I had the nights to gamble,

2   now that I lived in a studio apartment.

3          I've never purchased anything for myself from those

4   monies.  Yes, I was greedy.  I was greedy for that money, like

5   I may have already said, almost like a -- a junky would be for

6   a bag of heroin.  I just wanted that money to gamble.

7          Even the suit that I am wearing today was a gift to

8   me almost ten years ago.  I never even went out and bought

9   myself new clothes.

10         I couldn't bring myself to use those monies for

11  legitimate expenditures and, like I said, I want to apologize

12  to the members of my community.  I want to apologize to my

13  wife Sandy, who is here now, and I want to apologize to my

14  sons who at many times had read of my success as a police

15  officer, only to have been forced because of my hideous

16  actions to read about my disgusting behavior.  They have been

17  loving and loyal to me throughout this time.

18         I feel that I have addressed my addiction.  I have

19  not made a bet on anything in over 34 months.  I know I can

20  never be cured of compulsive gambling until I die, and I hope

21  that with my continued therapy that I will never gamble again.

22  I have instilled this value that I have come to know now since

23  I have been arrested in the members of my community that I

24  speak to and definitely in my children.

25         It's just so hard to face them and tell them.  They

1  know I am here today.  They've known every step of the game.

2  They are eleven and thirteen years old.  I just can't believe

3  I did what I did to them.  I am so sorry, but by the same

4  token, Your Honor, I am here today to be punished.  I deserve

5  to be punished.  What I did was horrendous.  I can't believe I

6  did it, but it is deserving of punishment.

7        The only thing I could say to the Court is, I will

8  take whatever that punishment may be and try to make good out

9  of it and instill that good not only in my values for the rest

10  of my life but hopefully as a lesson learned more for me but

11  also a lesson learned for my children and I humbly ask for

12  your mercy today not only for myself but for my continued

13  recovery and for my children.

14        I thank you and I'm sorry for the emotional

15  outburst.  I thank you for your time, Your Honor.

16        THE COURT:  You are welcome.

17        MR. ABENSOHN:  Your Honor, this is a difficult case

18  I think for a number of reasons.  Mr. Rachko was out of

19  control.  I don't know that there is any other way to put it.

20  There is a reason that his guidelines calculation is where it

21  is.

22        The overwhelming majority of rips during the period

23  of the conspiracy were on his initiative, through his CI's.  A

24  lot of this may well not have happened but for his conduct.

25        But by the same token, Your Honor, once this

1  defendant was arrested, I don't know if it was a slap in the

2  face or an epiphany, but once he was arrested --

3         THE COURT:  It was pretty much parallel.  He was

4  acting in tandem with Mr. Vasquez.  It is not as if he had a

5  lot more transactions.

6         MR. ABENSOHN:  Not a lot more transactions, Your

7  Honor.

8         THE COURT:  Greater?

9         MR. ABENSOHN:  He was essentially out of control in

10 seeking out information from informants in order to identify

11 opportunities for these transactions.

12        THE COURT:  All right.

13        MR. ABENSOHN:  In that sense, he was very much out

14 of control.  He was taking outrageous risks.  He was

15 overseeing a lot of CI's in order to get this information.

16        What is remarkable, Your Honor, and I -- as out of

17 control as he was for that period, I can tell the Court I've

18 never been in a position to say this about a defendant, but I

19 have colleagues who dealt with and knew this defendant before

20 he was arrested and separate from a lot of what went on and

21 these are colleagues that liked him, trusted him, believed in

22 him.  This is obviously a complicated man and there are

23 obviously two sides to this very sad story.

24        He was out of control.  Once he was arrested, he

25 had -- whatever epiphany some defendants go through and he

1  tried to make right on it, and that was from the earliest

2  opportunity, and as defense counsel has indicated, at least by

3  a matter of days it was from an earlier point than his

4  codefendants.

5  So again, Your Honor, I have tried to set forth in

6  the 5K letter that this defendant did stand up once he was

7  caught.

8  It is clear, that what he was doing was absolutely

9  outrageous, and whatever explanation there may be for it, it

10  is reprehensible and needs to be punished; but the defendant

11  has done what he can to make right by the government following

12  his arrest.

13  THE COURT:  As everyone points out, it is an

14  extremely complicated sentencing, as each of these sentencings

15  have been.  There are also very sad circumstances because

16  Mr. Rachko, like some other of the defendants, had very

17  positive aspects to their lives, and when you consider the

18  history and characteristics of the defendant, did some very

19  positive things.

20  The problem, of course, is that the crimes that they

21  committed are extraordinarily grave crimes.  As I have pointed

22  out, it was such a horrendous breach of the public trust to

23  use their position as police officers to steal money, to steal

24  drugs, Mr. Vasquez, taking the profits and selling these drugs

25  to obtain information from informants and compromise

1 | information in that way. It is just so extraordinarily
2 | serious and, as I have said before, it is so hard to
3 | understand why defendants who appear as otherwise good men
4 | somehow fall into this.

5 | The problem, however, is that the sentence has to
6 | reflect the seriousness of the offense and has to afford
7 | adequate deterrence to this type of criminal conduct.

8 | I believe that Mr. Rachko is remorseful. I feel
9 | that his statements are genuine, that his cooperation was
10 | genuine. I don't have any doubt about that at all, and that
11 | he's sought to rehabilitate himself.

12 | I don't think this is a situation where we have, for
13 | instance, the concern that we need to protect the public from
14 | further crimes of the defendant. I don't think this is a
15 | situation where the Court would ever see Mr. Rachko before it
16 | again. Certainly I would hope not.

17 | As I have pointed out before, when you hear talk
18 | about the guidelines, the guidelines are high. They are high
19 | because they reflect the very serious conduct that these
20 | officers were involved in, but much of that came from them and
21 | from their admissions. It is not that the government knew
22 | about this conduct and arrested them and charged them for it
23 | and then cooperated, which might often be the case with some
24 | of the individuals that you are speaking about, Mr. Lichtman,
25 | that the government knew about it already.

1          That is what drives these enormously high guidelines

2   here, which is their own candor about what they did.  But, on

3   the other hand, it can't be ignored.  That's what has to be

4   considered as well.

5          I believe that in this case, as the government has

6   pointed out, that there are competing factors.  Mr. Rachko

7   apparently was the first one to get the ball rolling with

8   respect to this cooperation, which is a positive factor.  It

9   also seems clear to me, reviewing the facts of these cases,

10  that he did have more of a leadership role than other

11  defendants that the Court has sentenced so far, that he got

12  this going, recruited other people, and that is a

13  distinguishing factor.  It is very complicated.

14         Having taken -- let me ask one question of the

15  government, something I neglected to bring up.

16         Is there a forfeiture issue here?

17         MR. ABENSOHN:  There is not, Your Honor.

18         THE COURT:  I thought there was some discussion of

19  some agreement.

20         MR. LICHTMAN:  It is part of the cooperation

21  agreement.  I think it was $800,000 in restitution, an order

22  to be entered.  Actually, it says in its discretion in an

23  order of restitution in the amount of $800,000.  He doesn't

24  have any assets.

25         THE COURT:  It's not really restitution.

1          MR. LICHTMAN:   It wouldn't be restitution.

2          MR. ABENSOHN:   The government is not seeking

3    restitution, Your Honor.

4          THE COURT:   The government is not seeking

5    restitution?

6          MR. ABENSOHN:   It is not, Your Honor.

7          THE COURT:   What about the issue of fine?

8          MR. ABENSOHN:   Your Honor, the government certainly

9    thinks some fine would be appropriate.

10          THE COURT:   Did you want to address yourself to

11    that?  I hadn't --

12          MR. LICHTMAN:   Judge, I can briefly.

13          All I would say is that any fine received by this

14    defendant is going to directly affect his two children and his

15    wife and not him.  I would ask that under these unusual

16    circumstances, where he literally has no assets at all, that

17    no fine be ordered.  Obviously, the fact that it is not

18    restitution, the factors that should be reviewed by Your Honor

19    in fixing a fine include hardship on the family.

20          THE COURT:   Assuming there was a fine that was

21    imposed that he was not required to pay until such point in

22    time as his supervised release began, it seems like he has the

23    capacity to get a job and to work.  Correct?

24          MR. LICHTMAN:   Absolutely.

25          I think that if Your Honor would consider a fine,

56

1   that it be fixed in a way that it garnishes a percentage of

2   his wages upon the completion of his supervised release.  I

3   would have no problem with that at all.  It would be

4   appropriate.

5          THE COURT:  All right.  As I said, I have determined

6   that under all of these extraordinarily complicated

7   circumstances, that I am going to sentence Mr. Rachko to the

8   custody of the Bureau of Prisons for a period of 84 months, to

9   be followed by a five-year term of supervised release.  I am

10  going to impose a-hundred-dollar special assessment.  I am

11  going to impose a fine of $10,000, to be paid over the

12  five-year term of supervised release, at increments of $2,000

13  a year.

14         Is there anything that I have overlooked?

15         MR. ABENSOHN:  Your Honor, there are open counts in

16  the indictment.  The government moves to dismiss those.

17         THE COURT:  The application is granted.

18         He has a right to appeal?

19         MR. ABENSOHN:  He does, Your Honor.

20         THE COURT:  Mr. Rachko, if you think the Court has

21  made any error in your sentencing, you have a rate to appeal.

22  Any notice of appeal has to be filed within ten days.

23         Do you understand that?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  Is there anything further that we need

57

1   to take up?

2           MR. LICHTMAN:   Just one.

3           MR. ABENSOHN:   Not from the government.

4           THE COURT:   Surrender date, is he seeking to

5   voluntarily surrender?

6           MR. LICHTMAN:   Yes, I would ask for voluntarily

7   surrender.   Now we are in the middle of October, I would ask,

8   if possible, Your Honor would allow him to surrender after the

9   holidays in December.

10          THE COURT:   I think it takes that long to do that,

11  to get the process of the prison designated.

12          Ms. Holley, the first week in January?

13          THE CLERK:   January 5th.

14          THE COURT:   Yes.

15          You have to meet with the marshals now to start the

16  process.

17          MR. LICHTMAN:   Yes.

18          THE COURT:   You understand, Mr. Rachko, you have to

19  pay your own money to get to whatever prison is designated.

20          THE DEFENDANT:   Yes, Your Honor.

21          THE COURT:   Okay.

22          MR. ABENSOHN:   Thank you.

23          MR. LICHTMAN:   Thank you, Judge.

24          (Matter concludes.)

25